FILED

09/29/2025

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 5, 2025

**STATE OF TENNESSEE v. DAVID PATRICK LAUDERDALE**

**Appeal from the Circuit Court for Madison County**
**No. 21-609    Kyle C. Atkins, Judge**

_____

**No. W2024-01004-CCA-R3-CD**

_____


The Defendant, David Patrick Lauderdale, was convicted by a jury of domestic assault, interfering with an emergency call, robbery, resisting arrest, felony evading arrest in a motor vehicle, aggravated assault, leaving the scene of an accident, violating the financial responsibility law, and driving with a canceled, suspended, or revoked license.  On appeal, the sole issue presented for our review is whether the evidence is sufficient to support the robbery conviction.  After review, we affirm the judgment of the trial court.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which KYLE A. HIXSON, and STEVEN W. SWORD, JJ., joined.

J. Colin Morris, Jackson, Tennessee, for the appellant, David Patrick Lauderdale.

Jonathan Skrmetti, Attorney General and Reporter; Ryan W. Davis, Assistant Attorney General; Jody Pickens, District Attorney General; and Bradley F. Champine, Assistant District Attorney General, for the appellee, State of Tennessee.


**OPINION**

The facts giving rise to this case stem from the Defendant's assault of the victim, his then-girlfriend, Teresa Primm, at a laundromat on April 29, 2021.  As the victim spoke to the 911 operator, the Defendant grabbed the victim's cell phone from her, ended the 911 call, and exited the laundromat with the victim's cell phone.  Upon arrival at the scene, an officer attempted to detain the Defendant, and he refused to comply with the officer's commands, fled on foot, and got into a nearby car.  The officer followed the Defendant to the car, physically grabbed the Defendant as he entered the open driver's side door and a

struggle ensued. The Defendant placed the car in reverse and accelerated while the officer was caught by the driver's side door. The officer was dragged by the car several feet and his body separated from the Defendant's car only when the Defendant's car struck another car in the parking lot. The officer suffered severe injuries based on his interaction with the Defendant. The events inside and outside the laundromat and the subsequent pursuit of the Defendant were recorded by laundromat video surveillance and the officers' body camera. For his conduct, on November 1, 2021, a Madison County Grand Jury indicted the Defendant on the following offenses: domestic assault, interference with an emergency call, robbery, resisting arrest, felony evading arrest in a vehicle, attempted second degree murder, aggravated assault, leaving the scene of an accident, violating the financial responsibility law, driving with a canceled, suspended, or revoked license, driving with a canceled, suspended, or revoked license while being a prior offender, and attempted carjacking. Prior to trial, the Defendant entered a guilty plea to driving on a revoked license while being a prior offender. Following trial, the Defendant was convicted of several offenses, including robbery, for which he received an effective sentence of forty-four years. The Defendant does not contest any of his convictions other than his robbery conviction, and he contends the evidence is insufficient because he did not intend to permanently deprive the victim of her cell phone. Accordingly, we will confine our recitation of facts to those relevant to the robbery conviction.

Teresa Primm, the Defendant's then-girlfriend and the victim, testified that, on April 29, 2021, she and the Defendant visited a local laundromat. The victim stated that she and the Defendant put their clothes in the washing machine, then went to get pizza from a nearby restaurant. When they returned to the laundromat, they put their clothes in the dryer and waited in her car for the clothes to finish. The victim stated that the Defendant was not acting like himself that day and it irritated her. While waiting in the car for the clothes to finish drying, the victim confronted the Defendant about his attitude and suggested that she would purchase him a bus ticket back to his home in Nashville. The victim stated that the Defendant became upset, grabbed her by her hair, said that "[they] need[ed] to go," and forced her into the laundromat to get the clothes. While in the laundromat, the Defendant shoved her to the ground and later attempted to drag her. He then grabbed the clothes that had been in one of the dryers and went back to the car. The victim called 911 and reported that the Defendant had hit her and left the building. During the 911 call, the Defendant came back inside the laundromat, pushed the victim into a chair, and slammed her head against a window before pulling her to the floor. He then took the victim's cell phone from her, ended the 911 call, and exited the laundromat with the cell phone. The victim said that she did not give the Defendant permission to take her cell phone and that she did not know where the cell phone was after the Defendant took it from her. The victim stated that throughout this whole incident, she was afraid, and the Defendant had hurt her.

Officer Sisk, a patrol officer with the Jackson Police Department (JPD), testified that he responded to a report of domestic violence in progress at the laundromat, and that a female was being actively assaulted by a male. He was advised that the suspect was a black male wearing a dark-colored jacket and dark clothing. Officer Sisk stated that when he arrived at the scene, he saw the Defendant who matched the description. Officer Sisk gave multiple commands for the Defendant to come talk to him, which were disobeyed. The Defendant then ran to his car, and Officer Sisk followed him. As the Defendant got in the driver's seat of the car and attempted to drive away, Officer Sisk physically grabbed the Defendant through the open driver's side door to stop him. A struggle ensued and the Defendant put the car in reverse and accelerated. As the Defendant was reversing, Officer Sisk was "caught by the driver's side door." He was dragged by the car for twenty feet in the parking lot until the Defendant cut the wheel of the car and slammed the officer into his own patrol vehicle. As a result, Officer Sisk suffered six broken ribs, two fractured vertebrae, a severe laceration to his right lower leg, and a broken volar plate in his right ring finger. Officer Sisk was wearing a body camera at the time of the incident, which was admitted as an exhibit at trial.

Talonda Sarsfield, an eyewitness at the laundromat, testified that she was sitting in her car with her children outside of the laundromat, and was able to see the physical altercation between the Defendant and the victim through a laundromat window. She observed the Defendant hitting the victim, but she could not hear anything because she was on the outside of the laundromat. Sarsfield also stated that, at that time, she could see that the victim was talking on her cell phone. When the police arrived and the altercation began between the Defendant and the police, Sarsfield and her children got out of her car and entered the laundromat because her car was "too close to the altercation." While inside, Sarsfield saw the victim crying and hugged her. Sarsfield stated that, at this time, the victim no longer had her cell phone.

JPD Sergeant Jay Stanfill, the case agent for this case, responded to a report of an officer injured in an incident involving a car driven by a suspect at the laundromat. Upon arrival at the scene, he noticed there were several surveillance cameras in the laundromat and collected the video recordings as evidence. Sergeant Stanfill later recovered Officer Sisk's body camera which had fallen on the floorboard of the victim's car during the struggle between the Defendant and Officer Sisk. He also recovered the body camera from another responding officer at the scene. Sergeant Stanfill stated that he made a compilation video that included all the video footage he recovered from that night and included the 911 call recording, which had been synced to the surveillance and body camera video recording. Sergeant Stanfill stated that, upon careful examination of the 911 audio and the laundromat surveillance video, he could see that right before the 911 call ended, the Defendant went up to the victim, made a "motion from the left side of his body, swiping, both hands come

together, and [he] walk[ed] out the door." The compilation video was admitted into evidence as an exhibit and played for the jury at trial.

On cross-examination, Sergeant Stanfill explained that the Defendant appeared to "snatch[]" the phone out of the victim's hand. The cell phone was later found in the backseat of the car driven by the Defendant. When asked if there was any way that the cell phone could have been found in the laundromat rather than the car, Sergeant Stanfill stated that, to the best of his knowledge, the cell phone was found in the car. When asked if there was any way that the cell phone found did not belong to the victim, Sergeant Stanfill said that he "can't say for sure[,]" but the cell phone matched the description given by the victim of her missing cell phone.

JPD Officer Austin McMullen testified that he went to the scene to assist Officer Sisk. As he arrived at the scene, he saw the Defendant's car reversing out of the laundromat parking lot and continuing to reverse down the street in the wrong direction. Officer McMullen began chasing the car on foot and witnessed the Defendant's car collide with another car. After the car accident, Officer McMullen saw the Defendant get out of his car and proceed to attempt to open the passenger side door of the car he struck. When that attempt failed, the Defendant fled on foot to a nearby restaurant parking lot, and Officer McMullen continued to chase him. Officer McMullen stated that the Defendant entered the restaurant and was standing in the waiting area when Officer McMullen arrested him.

At the close of proof, defense counsel made a motion for judgment of acquittal as to the robbery charge. Defense counsel argued that the State had not met their burden beyond a reasonable doubt for robbery and stated that "at best . . . it could be theft." The trial court determined that, in the light most favorable to the State, the State provided sufficient evidence to satisfy the elements of robbery to allow the case to proceed to the jury. Thus, the trial court dismissed the motion for judgment of acquittal on the robbery charge.

At the conclusion of trial, the jury convicted the Defendant of domestic assault, interfering with an emergency call, robbery, resisting arrest, felony evading arrest in a motor vehicle, aggravated assault, leaving the scene of an accident, violating the financial responsibility law, and driving with a canceled, suspended, or revoked license. The Defendant had previously entered a guilty plea to driving on a revoked license while being a prior offender. The Defendant was found not guilty of attempted second degree murder and attempted carjacking. Following a sentencing hearing, the trial court imposed an effective sentence of forty-four years in confinement.

- 4 -

Thereafter, the Defendant timely filed a motion for a new trial. After a hearing, the trial court denied the motion. This court then granted the Defendant's motion to late file a notice of appeal. This case is now properly before this court for review.

## ANALYSIS

The Defendant contends that the evidence is insufficient to support his robbery conviction because the State failed to prove beyond a reasonable doubt that he intended to deprive the victim of ownership of her cell phone. More specifically, he argues that he took the victim's phone "for the purpose of interfering with the victims attempt to call the police[,]" for which he was found guilty. The State responds that the evidence is sufficient to support the Defendant's robbery conviction. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

Robbery, as relevant here, is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A person commits theft "if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103(a). To deprive means to "[w]ithhold property from the owner permanently or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner[.]" Id. § 39-11-106(9)(a). Importantly, "[t]he intent to deprive may be based solely upon circumstantial evidence, and a 'jury may infer a . . . defendant's intent from the surrounding facts and circumstances.'" State v. Stewart, No. M2019-01421-CCA-R3-CD, 2020 WL 6494838, at *11 (Tenn. Crim. App. Nov. 5, 2020) (quoting State v. Roberts, 943 S.W.2d 403, 410 (Tenn. Crim. App. 1996) and omission in original), no perm. app. filed. "Moreover, the fact that the [d]efendant did not possess the owner's property for an extended period 'does not preclude a jury from finding that he possessed

the requisite intent for theft.'" State v. Hicks, No. W2022-00920-CCA-R3-CD, 2023 WL 4230430, at *4 (Tenn. Crim. App. June 28, 2023), no perm app. filed (quoting State v. Reed, No. M2020-00677-CCA-R3-CD, 2021 WL 4987974, at *2 (Tenn. Crim. App. Oct. 27, 2021)).

Viewing the evidence in the light most favorable to the State, the video surveillance recording showed the Defendant forcefully take the victim's cell phone from her as she was talking to the 911 operator, and he exited the laundromat with the cell phone. The victim testified that she did not give the Defendant consent to take her cell phone and that she did not know where the cell phone was after the Defendant took it from her. Law enforcement later recovered the cell phone from the victim's car after the Defendant crashed into another car while attempting to evade arrest. The Defendant's sole argument is that he did not intend to deprive the victim of her property but instead took the victim's phone only "for the purpose of interfering with the victim's attempt to call the police." However, the statute does not require a defendant to intend to permanently deprive the owner of property before a theft can occur. See State v. Harrison, No. E2008-01082-CCA-R3-CD, 2010 WL 3238309, at *9 (Tenn. Crim. App. Aug. 17, 2010) (rejecting argument that "the evidence is insufficient to sustain his conviction because he did not intend to deprive the owner permanently of his property"). Instead, a theft may also occur when, as here, the deprivation is "for such a period of time as to substantially diminish the . . . enjoyment of the property to the owner." Tenn. Code Ann. § 39-11-106(a)(9)(A); State v. Johnston, No. E1999-00496-CCA-R3-CD, 2001 WL 334298, at *4 (Tenn. Crim. App. Apr. 6, 2001), perm. app. denied (Tenn. Mar. 11, 2002). Accordingly, we conclude that the evidence was sufficient for a rational jury to find beyond a reasonable doubt that when the Defendant took the victim's cell phone and left the laundromat with it, he possessed the requisite "intent to deprive" the victim of her property as defined in Tenn. Code Ann. section 39-11-106(a)(9)(A). The evidence is sufficient to support the Defendant's robbery conviction, and he is not entitled to relief.

**CONCLUSION**

Based on the above reasoning and analysis, we affirm the judgment of the trial court.

s/ Camille R. McMullen

CAMILLE R. MCMULLEN, JUDGE

- 6 -